STATE OF CONNECTICUT *v.* HERBERT PRIOLEAU
(14896)

Peters, C. J., and Callahan, Berdon, Norcott and Palmer, Js.

Argued May 23—decision released August 22, 1995

*Susan M. Hankins*, assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *Elpedio Vitale*, assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Herbert Prioleau, was convicted by a jury of murder in violation of General Statutes § 53a-54a,[1] for fatally shooting the victim,

[1] General Statutes (Rev. to 1991) § 53a-54 provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse,

Anthony Vitale. On appeal,[2] the defendant claims that the trial court improperly: (1) instructed the jury on his claim of self-defense; (2) permitted the state to cross-examine him and offer rebuttal evidence regarding certain weapons and other related items found in his bedroom on the night of the shooting; (3) permitted the state to engage in inappropriate closing argument; and (4) instructed the jury on the element of intent. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In July, 1990, the defendant, Theresa Pierce and her two children[3] moved into the first floor apartment of a multiple unit dwelling at 422 Crown Street in Meriden. The victim and his young daughter resided directly across the street at 419 Crown Street.

Relations between the defendant and the victim, although initially cordial, began to deteriorate in April, 1991, because the defendant suspected that the victim had placed scratch marks on his motor vehicles. The defendant communicated his suspicions to the victim

the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . .

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

The defendant also was convicted of criminal possession of a firearm in violation of General Statutes § 53a-217 and of carrying a pistol without a permit in violation of General Statutes § 29-35. He has not contested these convictions.

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3), which provides that "[t]he following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[3] One of the children was the daughter of the defendant and Pierce, and the other child was the son of Pierce and another man. The defendant and Pierce were not married.

through a mutual acquaintance, but the victim denied having had anything to do with the vandalism. Thereafter, in June, 1991, the defendant discovered that the windows of his truck had been shattered with a rock, and he again suspected the victim of being the culprit. The defendant notified the police, who briefly questioned the victim, but did not make an arrest.

On October 21, 1991, and again on October 30, 1991, Officer Mary Cushman of the Meriden police department was dispatched to Crown Street in order to investigate complaints made by the victim against the defendant. As a result of the October 30 complaint, Cushman arrested the defendant and transported him to police headquarters for processing, after which the defendant was released pending a court appearance.[4]

In November, 1991, John L. Cardini, an acquaintance of both the defendant and the victim, told the defendant to avoid the victim because the victim, who was white, had told him that he intended "to kill that black motherfucker." Soon thereafter, however, the defendant encountered the victim in front of the defendant's house, and the two men engaged in a heated argument, at which time the defendant told the victim that he would "get him." The victim on several occasions during this time period expressed his fear that the situation between him and the defendant had escalated out of control.

On December 1, 1991, at approximately 6:15 p.m., the victim went to the apartment of Darlene Huffman, which was located on the second floor of the building where the defendant resided at 422 Crown Street, to pick up his daughter who was playing with Huffman's daughter. After his daughter persuaded him to permit her to stay a bit longer, the victim, at Huffman's invita-

---

[4] The state was precluded at trial, at the defendant's request, from explaining the substance of the victim's two complaints against the defendant.

tion, took several butter cookies from Huffman's cookie tray and left the apartment. As the victim descended the stairs leading to the first floor, Huffman, who had not yet closed her apartment door, heard the defendant say "you got a gun." Huffman immediately thereafter heard four to five gunshots fired in rapid succession. Huffman did not hear the victim say anything.

The defendant and a neighbor both immediately called the 911 emergency number, and several Meriden police officers were dispatched to the scene. Upon arrival, Officer Michael Zakrzewski saw the defendant standing in the first floor doorway, holding a .38 caliber revolver. The defendant was ordered to drop the gun, and thereafter was handcuffed and taken into custody.

When Zakrzewski entered the first floor foyer area of 422 Crown Street, he found the victim lying face up at the foot of the stairs, suffering from multiple gunshot wounds to various parts of his body. As the officers attended to the victim, they noticed that the victim had portions of a butter cookie in his mouth and had three whole butter cookies grasped in his right hand.[5] The officers also found a loaded .357 caliber revolver in the left rear pocket of the victim's pants. An ambulance transported the victim to a nearby hospital, where he later died from a gunshot wound to the head.

The defendant testified at trial and admitted that he had shot and killed the victim. He claimed, however, that he had done so in self-defense.[6] In support of his

[5] The victim's mother testified that the victim was right-handed.

[6] Self-defense is defined by General Statutes § 53a-19, which provides: "Use of physical force in defense of person. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

claim of self-defense, the defendant recounted a series of events that, he argued, had caused him reasonably to believe that he was in serious and imminent danger of death or serious bodily harm when he had encountered the victim descending the stairs from Huffman's apartment on December 1, 1991, and that had caused him reasonably to believe that he had needed to use deadly physical force in order to protect himself.

According to the defendant, on July 2, 1991, soon after his relationship with the victim began to deteriorate, he was climbing the steps leading from Crown Street to his house, when he heard a sound like the click of a gun's firing pin come from the vicinity of the victim's house. He spun around quickly and looked in the direction of the noise, but did not seen anyone. He was convinced, however, that it had been the victim's actions that had caused the sound.

The defendant also testified that on one occasion when he arrived home in the afternoon, he encountered the victim and several of the victim's friends sitting on

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

motorcycles in front of the victim's house.[7] The victim's friends were large, imposing individuals, attired in "motorcycle outfits" and toting "big guns." As the defendant ascended the steps to his home, he heard one of the victim's friends ask "You haven't got the low life out of the neighborhood yet?" The victim responded "He's going to leave."

The defendant testified that on the Monday before the Sunday shooting, the victim had approached him and stated "I told you if you call the cops on me again, I'm going to kill you." The defendant further testified that two days later, on Wednesday, the victim had said to him "You'll be dead before the end of the week."

The defendant also testified regarding a certain leather vest that the victim sometimes wore. The defendant had heard the victim on occasion describe this particular vest as his "killer jacket" that he liked to wear when he was "taking care of business." The evidence at trial indicated that the victim had been wearing the vest at the time of his death.

The defendant's testimony concerning the immediate circumstances surrounding the shooting death of the victim was as follows. He arrived home at 6 p.m., took off his jacket and began to watch television. Approximately thirty minutes later, he put his jacket back on because he was going to walk outside to "check on [his] car."[8] The jacket contained a loaded .38 caliber revolver in one of its pockets.

As the defendant walked into the foyer area immediately outside of his apartment, his front door closed and locked behind him. At precisely that moment, according to the defendant, the victim had completed his descent of the stairs from Huffman's apartment and

---

[7] The victim belonged to a motorcycle group known as the "James Gang."

[8] The defendant claimed that he regularly "checked on his car" between the hours of 6 and 6:30 p.m.

was also standing in the small foyer, just a few feet away from the defendant. When the victim saw him, the victim said "Here I am." The defendant responded by asking the victim "Tony, why are you trying to hurt me?" and by turning around and attempting to reenter his apartment. When the defendant realized that his door was locked, he turned around and saw the victim's hand reaching for the victim's rear pants pocket. At this point, the defendant realized for the first time that the victim had a gun. He then quickly pulled out his own weapon and began firing at the victim. The defendant testified that he believed that had he not shot the victim, he "wouldn't be here now." Additional facts and testimony will be enumerated hereinafter as pertinent.

At the conclusion of the evidence at trial, the trial court instructed the jury on the defendant's claim of self-defense. The jury, however, returned a guilty verdict, and the trial court thereafter sentenced the defendant to an effective term of life imprisonment. This appeal followed.

## I

The defendant first contends that the trial court improperly instructed the jury on his claim of self-defense.[9] According to the defendant, the court improp-

[9] The trial court's instruction on self-defense stated in relevant part: "The defendant claims that his use of deadly physical force was justified as self-defense. Now, that requires that I explain to you the applicable rules of law on the use of force in self-defense. Self-defense is a legal defense to the use of force which otherwise would be criminal. . . . A person is justified in the use of reasonable physical force upon another when he reasonably believes that such force is necessary to protect himself from the use or impending use of physical force by another. Reasonable force is that force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more. You must find the defendant not guilty on the grounds of self-defense unless the State has proved beyond a reasonable doubt any one of the following things: One, that the defendant did not believe that he was in imminent danger of death or serious physical injury and that the use of force was not necessary to protect himself. . . . Two  He did not have reasonable grounds for such belief. . . . Three. The

erly: (1) directed the jury to use a purely objective test, rather than the required subjective-objective test, in determining whether the defendant reasonably had believed that the use of deadly force was necessary; (2) failed to instruct the jury that the first person to

force used was unreasonable. . . . . Four. He was the initial provocator or aggressor and he did not attempt to withdraw. . . . . Now, the danger or apparent danger claimed by the defendant is to be determined from his standpoint at the time of the attack and under all of the surrounding circumstances. The act leading to the defendant's claim of self-defense need not be an actual threat or assault. It is not what the other person actually intended, but what his act caused the defendant to reasonably believe what was his intention. In other words, the danger need not have been actual if the defendant reasonably believed that the danger was actual, real, imminent or unavoidable. In judging the danger to himself, however, the defendant is not required to act with infallible judgment. Ordinarily, one exercising the right of self-defense is required to act instantly and without time to deliberate and investigate under such circumstances so that it is possible to mistake an actual threat when none, in fact, existed, but the law does not require the same coolness and judgment in exercising his judgment. In reviewing the facts of this case note, however, that the defendant's belief of danger must be honest and sincere. Apparent danger with the knowledge that no real danger exists is not an excuse for using force. A defendant claiming a justification of self-defense may only use reasonable force to defend himself. The use of deadly force is reasonable only to resist a threat of death or serious physical harm. A defendant claiming a justification of self-defense is permitted to use deadly force in two broad circumstances. He may justifiably use deadly force only if he has reason to believe that the other person was, one, using or about to use deadly physical force, or, two, inflicting or about to inflict great bodily harm. By definition self-defense means the use of defensive force. Therefore, a person claiming this right must act honestly and conscientiously and not from anger, malice or revenge. He must not provoke or intentionally bring the attack upon himself in order to provide an excuse to use force against another person. A person is not justified in using physical force when, one, with intent to cause physical injury or death to another person he provokes the use of physical force by another person, or, two, if he's the initial aggressor . . . . The degree of force used must be reasonable but deadly force may be used to counter perceived deadly force. . . . The key word here is reasonable. First of all, the defendant must have a reasonable belief that the other person is about to inflict great bodily harm or death upon him. It is not an irrational belief nor is it a belief which is not justified by all the circumstances there and then existing nor is it necessarily the belief that the defendant, in fact, had. It is the belief that a reasonable person would have under the same circumstances. The use of deadly physical force must be that degree of force which a reasonable person in the same circumstances would have used. If

use physical force is not necessarily the "initial aggressor"; and (3) instructed the jury on the issue of provocation when the evidence did not support such an instruction.[10]

The applicable principles of law governing the defendant's claims are well established. " '[A] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Bethea*, 167 Conn. 80, 83, 355 A.2d 6 (1974). This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the

---

the use of this force is excessive or unreasonable in view of all the circumstances, the defendant is not entitled to the defense of self-defense. Whether the defendant's belief was reasonable, whether the use of deadly force was reasonable, whether he provoked the use of force or whether he was the aggressor are all questions for you to determine from the evidence."

While the jury was deliberating, it sent a written request to the trial court to repeat "the four factors for self-defense." Upon this request, the court recharged the jury in relevant part as follows: "You must find the defendant not guilty on the grounds of self-defense unless the State has proved beyond a reasonable doubt any one of the following things: One. The defendant did not believe that he was in imminent danger of death or serious physical injury and that the use of force was not necessary to protect himself. . . . Two. He did not have reasonable grounds for such belief. . . . Three. The force used was unreasonable. . . . Four. He was the initial provocator or aggressor and he did not attempt to withdraw."

[10] The state claims that because the defendant failed to take an exception to those portions of the trial court's jury instruction on self-defense that he now attacks, we must review his contention only in accordance with the familiar principles of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We note, however, that the defendant had submitted a proper request to charge on the issue of self-defense in accordance with Practice Book § 852. Although we acknowledge that the defendant's failure to object to the instruction given by the trial court to some extent reflects the fact that the present claim has assumed an importance on appeal that was not evident at trial; see *State* v. *Negron*, 221 Conn. 315, 330, 603 A.2d 1138 (1992); we nevertheless conclude that the defendant properly preserved his claim for review by means of his request to charge. See *State* v. *Ash*, 33 Conn. App. 782, 794–95, 638 A.2d 633, rev'd on other grounds, 231 Conn. 484, 651 A.2d 247 (1994).

state has met its burden of proving beyond a reasonable doubt that the assault was not justified. *State* v. *Corchado*, 188 Conn. 653, 660, 453 A.2d 427 (1982).' " *State* v. *Ash*, 231 Conn. 484, 492–93, 651 A.2d 247 (1994), quoting *State* v. *Anderson*, 227 Conn. 518, 526, 631 A.2d 1149 (1993).

"An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . In either instance, [t]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. *State* v. *Anderson*, supra, 227 Conn. 526–27." (Citations omitted; internal quotation marks omitted.) *State* v. *Ash*, supra, 231 Conn. 493. In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the "charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. *State* v. *Estep*, 186 Conn. 648, 651–52, 443 A.2d 483 (1982); *State* v. *Harris*, 172 Conn. 223, 226, 374 A.2d 203 (1977); *Farlow* v. *Connecticut Co.*, 147 Conn. 644, 648, 166 A.2d 202 (1960); *Amato* v. *Desenti*, 117 Conn. 612, 617, 169 A. 611 (1933). The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Reed*, 174 Conn. 287, 305, 386 A.2d 243 (1978); *State* v. *Holmquist*, 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. *State* v. *Roy*, 173 Conn. 35, 40, 376 A.2d 391 (1977); *State* v. *Mullings*, 166 Conn. 268, 274–75, 348 A.2d 645 (1974)." (Internal quotation marks

omitted.) *State* v. *Ash,* supra, 493–94, quoting *State* v. *Dyson,* 217 Conn. 498, 501–502, 586 A.2d 610 (1991).

A

We first address the defendant's challenge to that portion of the trial court's self-defense instruction relating to the degree of force used by the defendant. The defendant contends that the trial court's definition of "reasonable force" as that amount of force which "an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury" improperly directed the jury to employ a purely objective test in determining whether he had reasonably believed it necessary to have used deadly force to repel the victim's alleged attack. Consequently, the defendant claims, the instruction failed to explain adequately to the jury the need to examine and evaluate the defendant's subjective belief as to the amount of force necessary to defend himself against the victim, and thereby diluted the state's burden of disproving self-defense beyond a reasonable doubt. The state, on the other hand, argues that the trial court's instruction, although not delivered in the verbatim language of § 53a-19, did not alter the substantive meaning of the statute, and thus properly explained the manner in which the jury was to evaluate the defendant's use of force. In the alternative, the state claims that, for several reasons, any impropriety in the court's charge was harmless beyond a reasonable doubt. Although we agree with the defendant that the trial court's instruction inadequately informed the jury of its need to evaluate the defendant's subjective belief as to the amount of force necessary to repel the victim's alleged attack, we conclude that, from the facts, the issues and the instructions as a whole, there is no reasonable possibility that this infirmity misled the jury to an improper verdict.

Pursuant to § 53a-19 (a); see footnote 6; a person may justifiably use *deadly* physical force in self-defense only

if he *reasonably* believes *both* that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, *and* (2) that deadly physical force is necessary to repel such attack. *State* v. *DeJesus*, 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984); see also *State* v. *Carter*, 232 Conn. 537, 546, 656 A.2d 657 (1995). We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a "subjective-objective" one. "The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." *State* v. *DeJesus*, supra, 389 n.13; see also *State* v. *Carter*, supra, 546; *State* v. *Anderson*, supra, 227 Conn. 533; *State* v. *Corchado*, supra, 188 Conn. 663.

The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. *State* v. *Miller*, 36 Conn. App. 506, 511, 651 A.2d 1318, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995); *State* v. *Williams*, 25 Conn. App. 456, 464, 595 A.2d 895, cert. denied, 220 Conn. 916, 597 A.2d 339 (1991). The jury's initial determination, therefore, requires the jury to assess the veracity of witnesses, often including the defendant, and to determine whether the defendant's account of his belief in the necessity to use deadly force at the time of the confrontation is in fact credible. This probe into the defendant's actual state of mind clearly

demonstrates "the function of the jury in [its] evaluation of the self-defense claim." *State* v. *Corchado*, supra, 188 Conn. 663.

If the jury determines that the defendant had not believed that he had needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether *that belief* was reasonable, from the perspective of a reasonable person in the defendant's circumstances. *State* v. *Miller*, supra, 36 Conn. App. 512; *State* v. *Williams*, supra, 25 Conn. App. 464, 466. Thus, if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19. *State* v. *Williams*, supra, 466 (defendant's subjective belief ultimately must be judged against that of reasonably prudent person); W. LaFave & A. Scott, Criminal Law (2d Ed. 1986) § 5.7 (c), pp. 457–58 (in most jurisdictions, honest belief in necessity of self-defense not sufficient if belief not objectively reasonable).[11]

---

[11] The fact that the defendant's belief that he had needed to use deadly force, as opposed to some lesser degree of force, ultimately must be found objectively reasonable is evident from our decision in *State* v. *DeJesus*, supra, 194 Conn. 376, the case in which we first described the test for degree of force as "subjective-objective." There, the defendant had become engaged in a fight with two individuals wielding machetes. The defendant had obtained an iron pipe, and struck both individuals on their heads, thereby causing them to drop their machetes and fall to the ground. The defendant thereafter continued to strike the victims with the pipe for approximately three to five minutes, and both victims subsequently died as a result of the injuries received from the defendant's blows. On appeal from his manslaughter conviction, the defendant claimed that the trial court had improperly instructed the jury on his claim of self-defense. According to the defendant, the trial court's instruction that if the blows that initially incapacitated the victim were not found to be "death blows," the jury would have to find that the defendant was not justified, after the victims were incapacitated, in continuing to beat

We begin by noting that we agree with the defendant that the trial court's instruction failed to inform the jury adequately that it must "examine and evaluate the defendant's subjective belief as to the amount of force necessary." Indeed, the state has conceded that the court's charge lacked "an express instruction to consider the defendant's subjective beliefs concerning the reasonableness of the degree of force used."[12] This, however, does not end our inquiry. We must go on to determine whether there is any possibility that this shortcoming in the trial court's instruction misled the jury to an improper verdict. *State* v. *Ash*, supra, 231 Conn. 493.[13]

The harmlessness of an error in a jury instruction is gauged by reference to both the evidence and issues in the case and the charge as a whole. Id., 496. With this in mind, we first note that in the trial of the present

them, failed to give effect to the defendant's subjective belief that he was still fighting for his life throughout the incident. We indicated that although the defendant may have believed that it was necessary to have continued to beat the victims after they were incapacitated in order to protect himself, the Connecticut test for degree of force also encompasses an objective element. Thus, because "[t]he jury could have reasonably concluded that the defendant did not reasonably believe that the degree of deadly force he exercised, in continuing to beat the victims in the manner established by the evidence, was necessary under the circumstances to thwart any immediate attacks from either or both of the victims," we concluded that the challenged portion of the trial court's instruction was not improper. Id., 392.

[12] We previously have indicated that a definition of "reasonable force" as "that force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more," fails to direct the jury to evaluate the defendant's subjective belief as to the amount of force necessary. *State* v. *Anderson*, supra, 227 Conn. 533.

[13] The state claims that the trial court's improper instruction was "harmless beyond a reasonable doubt." "We have equated this constitutionally required formulation of the harmless error standard . . . with our formulation that an instructional constitutional error is harmless if there is no reasonable possibility that the jury was misled. . . . We perceive no functional difference between the two formulations." (Citations omitted; internal quotation marks omitted.) *State* v. *Ash*, supra, 231 Conn. 493–94 n.5, quoting *State* v. *Cerilli*, 222 Conn. 556, 584 n.16, 610 A.2d 1130 (1992).

action, the state presented in excess of twenty witnesses, whose testimony painted a picture of an escalating feud between the defendant and the victim, culminating in, according to the state, the "ambush" and "cold-blooded execution" of the victim by the defendant.[14] The defendant, on the other hand, relied primarily upon his own testimony,[15] which was to the effect that in the weeks immediately preceding the day of the shooting, he had become frightened of the victim to such an extent that he had believed that the victim was going to attempt to kill him. The state did not present evidence, however, nor did it argue to the jury, that the defendant was guilty of murder because he had used an *excessive degree of force* in protecting himself. Indeed, the question of whether the defendant had reasonably believed that he had needed to use deadly force, as opposed to some lesser degree of force, in repelling the victim's alleged attack, never presented itself.[16] The theory of the state's case, rather, was that the defendant did not believe, at the time that he shot the victim, that the victim was about to attempt to kill him or cause

---

[14] In closing argument, the state stressed the fact that the victim was found dying with cookie crumbs in his mouth and cookies in his dominant right hand  The state also argued that the lighting in the foyer was poor, that the shots appeared to have been fired from a corner to the left of the stairs, and that the forensic testimony indicated that the defendant and the victim were not standing face to face when the victim was shot. On the basis of all of the evidence, the state argued, the jury could only conclude that the defendant had laid in wait and deliberately murdered the victim.

[15] The defendant testified along with two other defense witnesses.

[16] Despite the fact that the defendant had shot the victim four times, the state did not argue to the jury that the defendant had used an excessive amount of force in defending himself. Indeed, in closing argument, the state made very clear to the jury that its only job was to decide whether, as the state claimed, the defendant had "ambushed" the victim, or whether, as the defendant claimed, the defendant had acted in self-defense. On appeal, the defendant argues that his subjective beliefs were critical in this case, and we agree. The relevant beliefs, however, pertained to whether the victim was about to inflict deadly harm upon him, and not to whether the defendant had needed to use deadly force, as opposed to some lesser degree of force, in order to protect himself. The latter issue was simply not before the jury.

him serious bodily harm. The critical issue for the jury to decide in this case, therefore, was not whether the defendant had used a reasonable degree of force, but whether he had reasonably believed, when he shot the victim, that the victim was about to use deadly force or inflict great bodily harm upon him. Because the defendant has conceded that the trial court's instruction on this aspect of self-defense was proper; see discussion that follows; there is no possibility that the trial court misled the jury to an improper verdict by its failure to instruct properly on the issue of the reasonableness of the degree of force used.[17] See *State* v. *Quintana*, 209 Conn. 34, 47–48, 547 A.2d 534 (1988); *State* v. *Tate*, 34 Conn. App. 610, 617–19, 642 A.2d 1223, cert. denied, 231 Conn. 907, 648 A.2d 159 (1994); *State* v. *Paladino*, 19 Conn. App. 576, 578–79, 563 A.2d 321 (1989); cf. *State* v. *Ash*, supra, 231 Conn. 498–99.

Moreover, even had the jury deemed it necessary to focus on the defendant's belief as to the amount of force necessary to repel the victim's alleged attack, we are persuaded that, in viewing the trial court's instruction as a whole, it is not reasonably possible that the jury could have concluded that its inquiry was to be made solely in an objective manner. The defendant concedes that the trial court properly instructed the jury in both subjective and objective terms regarding the defendant's belief as to whether the victim was about to use deadly physical force upon him. In this regard, we note that the

[17] In *State* v. *Williams*, supra, 25 Conn. App. 456, the Appellate Court reviewed a trial court's instruction that charged solely in the objective regarding degree of force. In concluding that the error in the trial court's instruction could not have misled the jury, the Appellate Court noted that "the principal factual issues did not turn on the subtleties of the law of self-defense for their proof. See *State* v. *Quintana*, 209 Conn. 34, 47–48, 547 A.2d 534 (1988). The degree of force used by the defendant was not the central focus of the disputed testimony. Rather, the case presented to the jury concerned the question of determining what exactly happened leading up to the point that the defendant used force against the deceased." Id., 465. We conclude that the same analysis controls in this case.

trial court indicated that "the danger or apparent danger claimed by the defendant *is to be determined from his standpoint* at the time of the attack and under all of the surrounding circumstances," and that "[the defendant] may justifiably use deadly force only if *he* has reason to believe that the other person was [about to use deadly force]." (Emphasis added.) "Although the defendant's perception of the danger he faced and his use of force in response to that danger may be two distinct legal concepts for purposes of analyzing the trial court's instruction, they are so inextricably intertwined that they cannot be analyzed in a vacuum, one separated from the other. The degree of force used by a defendant must necessarily be evaluated in relationship to *something*. That something is the danger that was perceived by the defendant." (Emphasis in original.) *State* v. *Williams*, supra, 25 Conn. App. 465. Thus, notwithstanding the trial court's inadequate instruction regarding the defendant's belief in the necessity to use deadly physical force, because the court clearly directed the jury to evaluate the defendant's belief in the danger he claims to have faced from the defendant's subjective perspective, we conclude that it is not reasonably possible that the jury was misled to an improper verdict. See *State* v. *Jenkins*, 29 Conn. App. 262, 273–74, 614 A.2d 1249, cert. denied, 224 Conn. 916, 617 A.2d 171 (1992); *State* v. *Williams*, supra, 465–66.

In sum, we conclude that in this case, where the parties, the court and, most importantly, the jury, clearly understood the critical issue to be whether the defendant, at the time he shot and killed the victim, reasonably believed that the victim was about to use deadly force, and where the court properly instructed the jury on this crucial issue, the court's imperfect instruction regarding the defendant's belief in the acceptable degree of force was harmless beyond a reasonable doubt.

B

The defendant also claims that the trial court, in the portion of its self-defense instruction regarding the law of the "initial aggressor"; see footnote 9; improperly failed to explain to the jury that the first person actually to employ physical force is not necessarily the initial aggressor. According to the defendant, the trial court's instruction should expressly have apprised the jury that the "initial aggressor" might have been the person who first *threatened* to use force, rather than the person who first *actually used* force. We are not persuaded that the trial court's instruction did not so apprise the jury.

Generally, "a person is not justified in using physical force in self-defense if he is the initial aggressor. See General Statutes § 53a-19 (c) (2). Therefore, if the jury found that the defendant was the aggressor in his encounter with the victim, he could not prevail on his claim of self-defense. . . . It is not the law, however, that the person who first uses physical force is necessarily the initial aggressor under § 53a-19 (c) (2). . . . To attach such a meaning to § 53a-19 (c) (2) would run counter to the plain language of § 53a-19 (a), which states in pertinent part that 'a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or *imminent* use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or *about* to use deadly physical force, or (2) inflicting or *about* to inflict great bodily harm.' (Emphasis added.)" (Citations omitted.) *State* v. *Jimenez*, 228 Conn. 335, 339–41, 636 A.2d 782 (1994).

We begin by noting that the trial court in the present action, unlike the trial court in *Jimenez*, did not instruct the jury that the initial aggressor was necessarily the

person who first actually used physical force. The defendant contends, rather, that the court's instruction was improper because it lacked an *explicit direction* to the jury that the initial aggressor may be the person who first threatens to use force.[18]

Although the trial court did not specifically instruct the jury that the initial aggressor is not necessarily the first person actually to employ the use of force, that premise was implicit throughout the entire self-defense instruction. On several occasions, the trial court instructed the jury that the defendant was justified in using deadly physical force against the victim if the defendant had reasonably believed that "such force [was] necessary to protect himself from the use *or impending use* of physical force" by the victim. (Emphasis added.) The court also explained to the jury that it must find the defendant not guilty on the ground of self-defense unless the state proved beyond a reasonable doubt that "the defendant did not believe that he was in *imminent* danger of death or serious physical injury and that the use of force was not necessary to protect himself." (Emphasis added.) Finally, the court referred on various occasions to the danger or *apparent* danger that the defendant claimed to have faced, and also recited the statutory language of § 53a-19 (a) that the defendant "may justifiably use deadly force only if he has reason to believe that the other person was, one, using *or about to use* deadly physical force, or, two, inflicting *or about to inflict* great bodily harm." (Emphasis added.) In light of the entire self-defense instruction, therefore, the trial court sufficiently apprised the jury that it could have found the defendant not guilty of murder on the ground of self-defense even if the defendant was the first person actually to have used physical

[18] In *State* v. *Jimenez*, supra, 228 Conn. 335, we did not indicate that a trial court must explicitly state that the "initial aggressor" is not necessarily the first person to use force. Rather, we held only that a definition of "initial aggressor" as "the first to use physical force" is reversible error Id., 342.

force, so long as the defendant had reasonably believed that the victim was about to use deadly physical force against him.

## C

The defendant also contends that the trial court should not have instructed the jury on the issue of provocation; see footnote 9; because the evidence produced at trial did not warrant such an instruction. The defendant further contends that the instruction on provocation as given was incomplete and inaccurate. We decline to review either of these claims.

We will not review the defendant's claim that the trial court should not have instructed the jury on the issue of provocation, because the defendant's request to charge, which he submitted to the trial court at the conclusion of the evidence, included language on provocation. To request that the trial court instruct on an issue at trial, and then to claim on appeal that the court improperly granted such request, can at best be described as disingenuous. We do not sanction such a practice, and therefore do not consider the merits of the defendant's claim. See *State* v. *Walton*, 227 Conn. 32, 67, 630 A.2d 990 (1993); *State* v. *Hinckley*, 198 Conn. 77, 81 n.2, 502 A.2d 388 (1985).

The defendant also argues that the trial court's instruction on provocation was incomplete and inaccurate. He has, however, inadequately briefed that argument. He states, in one short paragraph of his brief, merely that the instruction "erroneously combined aspects of subsection (c) (1) of [§ 53a-19] with aspects of subsection (c) (2). The effect of these errors was to lower the standard of proof for the state, and thereby ease the convictions." The defendant has furnished us with no legal analysis of what particular language in the trial court's instruction "combined aspects" of § 53a-19 (c) (1) with "aspects" of (c) (2), or why this alleged combination

was improper. Moreover, the defendant has provided no case citations or other authority in support of his argument. We therefore refuse to review his claim. See *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991); *State* v. *Mozell*, 37 Conn. App. 574, 579–80, 657 A.2d 686 (1995).

## II

The defendant next contends that the trial court improperly permitted the state (1) to cross-examine him regarding certain weapons and other related items found in his bedroom on the night of the shooting, and (2) to present evidence regarding the weapons and other items during its rebuttal case. We disagree with both of these claims.

The underlying facts that give rise to the defendant's contentions are as follows. On the night of the shooting, Detective Robert Hettrick was assigned to assist in the investigation at 422 Crown Street. After obtaining a written consent from Pierce to search the defendant's apartment, Hettrick discovered a small cache of weapons, ammunition, and other items in the defendant's bedroom, including a .41 caliber revolver and bullets for that revolver, wooden pistol grips for a Rossi brand .38 caliber revolver, a holster for a revolver, a gun case containing a shotgun and several shotgun shells, a "speed loader" filled with .38 caliber cartridges, and miscellaneous boxes of shotgun shells. The defendant inspected the confiscated weapons and other items prior to the commencement of trial, and at that time, the state indicated that it did not intend to use the evidence, unless the defendant first "open[ed] the door."

At trial, the defendant testified on direct examination that he had shot the victim with a gun that he had kept in the pocket of his jacket. The defendant's attorney, however, specifically refrained from eliciting further tes-

timony from the defendant regarding where, when or why he had obtained the weapon used to kill the victim.

On cross-examination, the state and the defendant engaged in the following colloquy:

"Q. And you put on the same jacket you'd worn to work?

"A. That's right.

"Q. Which had the gun in it?

"A. That's right.

"Q. The .38 caliber gun, correct?

"A. That's right.

"Q. Which was loaded, correct?

"A. That's right.

"Q. When did you load the gun, sir?

"A. I didn't load the gun.

"Q. Oh, you didn't load the gun?

"A. No.

"Q. Who loaded the gun?

"A. The guy I bought it from.

"Q. So, you bought the gun already loaded?

"A. Yes.

"Q. When did you buy the gun, sir?

"A. On Monday after Tony told me he was going to kill me.

"Q. The Monday after Tony told you he was going to kill you. All right. Which was when, sir?

"A. That would be around the 25th or the 24th, something like that.

"Q. Of November?

"A. Yes, sir.

"Q. So, you needed to go buy a gun, is that your testimony?

"A. That's right.

"Q. Is that because you didn't have any guns in the house?

"A. That's right."

When the defendant answered "[t]hat's right," his counsel objected and requested that the jury be excused. In the absence of the jury, the state indicated that, based upon the testimony that had just been elicited from the defendant, it intended to question the defendant regarding the cache of weapons and other items found in the defendant's bedroom on the night of the shooting. The defendant argued that the state's question, "Is that because you didn't have any guns in the house?" was irrelevant, and requested that the court strike it and the accompanying answer from the record. The defendant also objected to the state's intention to inquire as to the items found in the defendant's bedroom, arguing that because those items were found on Sunday, their presence on that day did not tend to contradict the defendant's testimony that he had had no other weapons on the previous Monday, when he claimed to have bought the gun with which he had killed the victim.

The trial court rejected both of the defendant's objections, indicating first that the state's initial question was indeed relevant, because it had "to do with whether he needed to go out and purchase a loaded handgun for protection if [he] already had suitable guns at home. . . . It certainly has a bearing on his story that he's testifying to that he bought the gun as a result of the threat. . . . Now, if, in fact, the State has evidence that he had guns, other guns at that time, it might have some bearing on the believability of that story." With regard to the defendant's second objection, the trial court stated that because the time span between the Monday on

which the defendant claimed to have bought the .38 caliber revolver and the Sunday on which the other guns were found in the defendant's bedroom was not particularly lengthy, the evidence could be submitted for the jury's consideration.

When the cross-examination of the defendant recommenced, the state extensively questioned the defendant regarding the .38 caliber revolver used to kill the victim and the other weapons and paraphernalia found in his bedroom on the night of the shooting. The defendant explained that when the victim had threatened him on Monday, he had decided to purchase a weapon in order to protect himself. According to the defendant, he had sold a gold chain to a pawn shop in Meriden for $75, and then had traveled to Waterbury to a certain bar, where he spoke with an unknown individual who had sold him the .38 caliber revolver for $75. According to the defendant, at the time he bought it, he was unaware of the caliber of the gun, and the gun came fully loaded. The defendant did not indicate whether the weapon came with a holster or additional handle grips.

The defendant further testified that on the Wednesday before the shooting, the victim had threatened him again by indicating that "You'll be dead before the end of the week." As a result of this new threat, the defendant testified, he borrowed $50 from an acquaintance, again traveled to Waterbury, and purchased a shotgun. According to the defendant, he "was looking for another gun to back up [the] one I had." Although the defendant testified that no ammunition came with the shotgun at the time he bought it, he did not indicate whether the gun came contained in a carrying case.

With regard to the .41 caliber revolver confiscated from his bedroom, the defendant testified that he had found it in a truck parked in a junkyard on the day before the shooting. According to the defendant, he thereafter

had an acquaintance purchase ammunition for the gun from a Meriden gun shop. The defendant testified that he had found the speed loader, the .38 caliber ammunition, and the shotgun shells in a car in the same junkyard back in 1986 or 1987.

At the conclusion of the defendant's case-in-chief, the state announced its intention to offer the rebuttal testimony of Hettrick in order to contradict the defendant's testimony as to how and when he had obtained the weapon used in the homicide and the weapons and other items confiscated from his bedroom on the night of the shooting. In the absence of the jury, in an offer of proof, Hettrick, who indicated that he had extensive experience in the handling of firearms, testified regarding each of the items that was taken from the defendant's bedroom. Hettrick testified that the .41 caliber revolver was found in a well oiled, working condition. Hettrick further testified that the .38 caliber revolver used by the defendant to kill the victim fit perfectly into the holster found in the defendant's bedroom, and that the holster could not be used to carry a type of weapon other than a revolver. Hettrick also indicated that new firearms are sold with wooden handle grips on them, not with rubber grips like those found on the defendant's .38 caliber revolver. Hettrick then demonstrated that the Rossi brand wooden handle grips found in the defendant's bedroom fit the defendant's Rossi brand .38 caliber revolver perfectly. Hettrick also demonstrated that the confiscated speed loader, which the defendant testified he had found in a junkyard in 1986 or 1987, worked perfectly on the defendant's .38 caliber revolver when the wooden handle grips were attached.

The state argued that Hettrick's proposed testimony would serve directly to contradict the defendant's account of how, when and where he had obtained the .38 caliber revolver used to kill the victim and the weapons and other items found in his bedroom on the night

of the shooting. According to the state, the existence of the wooden Rossi brand handle grips, the existence of the holster, and the existence of the speed loader filled with .38 caliber cartridges, all of which Hettrick demonstrated fit the Rossi brand .38 caliber revolver that the defendant had used to kill the victim, tended to disprove the defendant's testimony that he had obtained the .38 caliber revolver on the Monday prior to the shooting from an individual in front of a Waterbury bar. The state further argued that Hettrick's proposed testimony regarding the well maintained condition of the .41 caliber revolver tended to disprove the defendant's assertion that he had found the weapon in an abandoned truck in a junkyard on the day before the shooting. The state also claimed that the existence of the well conditioned shotgun case, unmentioned by the defendant, served to discredit the defendant's account of his purchase of the shotgun from the street in Waterbury.

The defendant, on the other hand, argued that the obvious prejudicial effect upon the jury both of Hettrick's proposed testimony and the physical presence of the weapons and other items as exhibits would far outweigh the probative value claimed by the state. Additionally, the defendant argued, Hettrick's testimony regarding the weapons and other paraphernalia was not relevant to discredit the defendant's testimony regarding how, when and where he had obtained those items, for various reasons. First, according to the defendant, the fact that the .41 caliber revolver contained an oily residue at the time of trial did not prove that the gun had been recently maintained, and thus did not serve to refute the defendant's testimony that he had found it in a junkyard, because the gun had been in the possession of the police for approximately two years before the trial began, yet it nevertheless remained in a well oiled condition. Second, the defendant argued that the existence of the holster and the shotgun case did not tend to contradict the

defendant's testimony regarding how, where and when he had obtained the .38 caliber revolver and the shotgun, because the defendant was never specifically asked about the holster or the carrying case.

The trial court disagreed with the defendant, and concluded: "I think the jury is entitled to see these things to determine whether or not the story [the defendant has] told is worthy of belief or not. . . . [The defendant] opened this door up by trying to create the impression with the jury that he went and purchased the .38 because he needed something to protect himself after the threats and he had nothing else to protect himself with. Then, of course, he went out and got these other things and he bought the shotgun, as he said, as a backup. Exactly what that means, I'm not sure, but that's what he said. I think he used the term a backup. I think they're admissible." The court thereafter permitted Hettrick to testify in the presence of the jury, and permitted the state to introduce several of the weapons and related items into evidence as full exhibits. The trial court instructed the jury that the only purpose for which the exhibits were admitted was to contradict the testimony of the defendant as to where, how and when he had acquired them.

### A

The defendant first contends that the trial court improperly permitted the state to cross-examine him regarding the weapons and other items found in his bedroom on the night of the shooting. The defendant posits several bases supporting this contention, none of which we find persuasive.

### 1

The defendant initially points out that although he testified in detail on direct examination regarding the shooting itself and the circumstances leading up to the fatal encounter, he intentionally refrained from testifying

as to the type of gun used or as to where, when or how he had acquired it. Thus, the defendant claims, he did not "open the door" on direct examination to subsequent questions on cross-examination regarding the weapons and other items found in his bedroom on the night of the shooting, and therefore any questions by the state pertaining thereto should have been precluded by the trial court as beyond the scope of direct. The state argues, on the other hand, that regardless of whether the defendant had opened the door on direct examination to subsequent questions regarding the weapons found in his bedroom, the defendant's testimony in response to legitimate questions on cross-examination regarding the weapon used to kill the victim permitted the trial court to allow the state to delve further into the circumstances surrounding the defendant's acquisition of the weapons and their accoutrements. We agree with the state.

"[I]t is settled Connecticut law that inquiry upon cross-examination is limited by the scope of the direct examination . . . . [T]hat scope is determined by all of the evidence offered during direct examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Schroff*, 198 Conn. 405, 411, 503 A.2d 167 (1986). "Cross-examination may solicit any facts that tend to rebut or modify any material conclusion or inference resulting from the direct examination." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 3.4.3 (b), p. 45. The trial court, however, "has wide discretion to determine the scope of cross-examination. *State* v. *Jackson*, 198 Conn. 314, 319, 502 A.2d 865 (1986); *State* v. *Sharpe*, 195 Conn. 651, 657, 491 A.2d 345 (1985); *State* v. *Thompson*, 191 Conn. 146, 148, 463 A.2d 611 (1983); *Akers* v. *Singer*, 158 Conn. 29, 36, 255 A.2d 858 (1969); *State* v. *Kurz*, 131 Conn. 54, 37 A.2d 808 (1944). Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. *State*

v. *Jackson*, supra, [319] quoting *State* v. *Briggs*, 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. *State* v. *Williamson*, [206 Conn. 685, 698, 639 A.2d 561 (1988)], quoting *State* v. *Howard*, 187 Conn. 681, 685, 447 A.2d 1167 (1982); see also *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983). Our review is limited to whether the trial court's rulings exceeded the latitude accorded its discretion in such matters. *State* v. *Williamson*, supra, 698–99." (Internal quotation marks omitted.) *State* v. *Hernandez*, 224 Conn. 196, 208, 618 A.2d 494 (1992).

We initially note that the state asked the defendant, without objection, when he had bought the weapon used in the homicide, and the defendant answered, again without objection, "on Monday after [the victim] told me he was going to kill me." The defendant has never contended that this initial question was improper.

Following up on the defendant's response as to when, and implicitly why, he had obtained the .38 caliber revolver, the state next asked the defendant whether the reason he had needed to obtain the weapon was because he had no other guns in his house. When the defendant answered "[t]hat's right," his trial counsel objected and requested that the question and answer be stricken as irrelevant. The trial court overruled the defendant's objection, concluding that based upon the previous unchallenged question and answer, the question at issue was "relevant to the inference that [the defendant is] asking this jury to draw about the possession of the loaded handgun and his explanation is I got it for protection after I was threatened by the victim, and it's relevant as to why he had to go out and felt it necessary to buy a loaded gun from a guy and because

he didn't have another gun in the house, that's relevant." "Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) Id., 208. The trial court concluded that the state's question had a bearing on the defendant's testimony that he had obtained the weapon as a result of the victim's Monday threat, because if the jury were to determine that the defendant had other weapons in his home on Monday, it might also infer that the defendant would not have needed to obtain the .38 caliber revolver to protect himself. In this murder prosecution in which the crucial issue was the defendant's claim of self-defense, where the defendant had previously testified that he had obtained the weapon used in the homicide as a direct result of a threat by the victim, we are not persuaded that the trial court abused its broad discretion in permitting the state to make further inquiry of the defendant as to why he had acquired that weapon.

Because the trial court did not abuse its discretion in permitting the state to ask the defendant why he had obtained the weapon used in the homicide, in light of the defendant's response that the reason was that he had no other guns in his house, the court was also within its discretion in permitting further cross-examination concerning the weapons found in his bedroom, provided that the evidence of the weapons was relevant to impeach the defendant's testimony that he bought the .38 caliber revolver on Monday because he had no other guns in his house, and provided the probative value of that evidence was not outweighed by its potential prejudicial effect on the jury. See 1 C. McCormick, Evidence (4th Ed. 1992) § 33, p. 112, and § 49, pp. 187–88. We now turn to those provisos.

2

The defendant claims that the existence of the weapons in his bedroom *on the night of the shooting* was not relevant to disprove his testimony that he had owned no other weapons *six days earlier*. The defendant further contends that because the six day time span eliminated most, if not all, of the probative value that otherwise might have attached to the presence of the weapons in the bedroom, the trial court necessarily should have precluded the state from referring to those items due to their highly prejudicial nature.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. *Pitt* v. *Kent*, 149 Conn. 351, 357, 179 A.2d 626 (1962). One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. *State* v. *Blake*, 69 Conn. 64, 76, 36 A. 1019 (1897). . . . Evidence is irrelevant or too remote if there is 'such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter.' *State* v. *Kelly*, 77 Conn. 266, 269, 58 A. 705 (1904). A party is not required to offer such proof of a fact that it excludes all other hypotheses; it is sufficient if the evidence tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. *State* v. *Briggs*, [supra, 179 Conn. 328] . . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987); *State* v. *Morrill*, 197 Conn. 507, 548, 498 A.2d 76 (1985)." (Citations omitted; emphasis in original.) C. Tait & J. LaPlante, supra, § 8.1.1, pp. 225–26.

The state argues, the trial court found, and we agree, that despite the fact that the weapons were found in the defendant's bedroom after the shooting and six days after the day on which he claimed to have had no guns, the existence of the weapons in the defendant's bedroom on the night of the shooting tended to disprove the defendant's assertion that on Monday he had had to obtain the weapon used to kill the victim because he had been threatened and he had no other weapons in his house. We agree with the trial court that because the time span between the day the defendant claims to have been without any weapons, Monday, and the day he was found to have weapons, Sunday, was only six days, there is not "such a want of [an] open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." *State* v. *Kelly*, supra, 77 Conn. 269. Although the jury could have chosen to believe the defendant's account of when the other weapons were obtained, it could also have determined from the evidence presented by the state that the defendant did in fact possess them on Monday. Because the evidence of the weapons and other items found in the defendant's bedroom on the night of the shooting tended to make it less probable than without that evidence that the defendant possessed no other guns on the day he claims to have acquired the .38 caliber revolver used in the homicide, the trial court in the exercise of its discretion properly determined that the state's cross-examination was relevant.

The defendant also argues that even if the evidence of the weapons and other items found in his bedroom on the night of the shooting was relevant to disprove his testimony that he had obtained the gun used to kill the victim because he had possessed no other weapons, the trial court nevertheless should have precluded the

state's cross-examination because the probative value of the evidence was substantially outweighed by its potential prejudicial effect on the jury. We disagree.

We have previously "outlined four situations where prejudice to the defendant could outweigh the probative value of evidence. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Greene*, 209 Conn. 458, 478–79, 551 A.2d 1231 (1988). We have also noted, however, that ultimately, "[a] trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission. . . . We will not overturn its decision absent an abuse of discretion." (Citations omitted.) *State* v. *McGraw*, 204 Conn. 441, 449–50, 528 A.2d 821 (1987).

We agree with the defendant that because he was charged with three crimes each involving the use or possession of a firearm, the evidence of the weapons found in his bedroom had the potential to arouse the jury's emotions. We note, however, that the evidence of the weapons was not offered by the state concerning a "side issue," but rather to disprove the defendant's testimony bearing upon the very heart of his theory of self-defense—that he had obtained the .38 caliber revolver on Monday because the victim had threatened to kill him. If, as the state points out, the jury had chosen to disbelieve the defendant's testimony that he possessed no other weapons on Monday, it might also have disbelieved the defendant's testimony that he had

purchased the .38 caliber revolver on that day to protect himself after the threat. Further, if the jury had chosen to disbelieve the defendant's testimony that he had obtained the .38 caliber revolver on Monday, it may also have chosen to disbelieve his testimony that the victim had threatened to kill him on that day. Mindful of the fact that the state bore the burden of disproving the defendant's claim of self-defense beyond a reasonable doubt, we cannot conclude that the trial court abused its broad discretion in permitting the state to impeach the defendant's account of when and why he had obtained the weapon used in the killing.[19]

### B

The defendant next contends that the trial court improperly permitted the state to offer the rebuttal testimony of Hettrick and to introduce the weapons and other items into evidence as exhibits, because that evidence was improper "extrinsic misconduct evidence" offered solely to contradict the defendant's testimony on a "collateral matter." Moreover, according to the defendant, any probative value inherent in the physical presence of the weapons and other items was far outweighed by the potential prejudicial effect upon the jury of having those items in the deliberation room. We refuse to review the first claim, and disagree with the second claim.

As we have previously indicated, after the state proffered Hettrick's testimony outside the presence of the

---

[19] Moreover, the defendant cannot seriously contend that he had no reasonable ground to anticipate the state's cross-examination questions regarding the weapons and related items found in his bedroom on the night of the shooting, or that he was unfairly surprised and unprepared to address these questions. The defendant admits that his trial counsel had inspected the weapons and other items prior to the commencement of trial. Although the assistant state's attorney prosecuting the matter told the defendant's counsel that he did not intend to use the evidence at trial, he expressly made that intent subject to the defendant "opening the door."

jury, the defendant articulated his objections at great length. The substance of his objections was twofold: first, that Hettrick's testimony was not relevant to the purpose for which the state offered it, namely, to contradict the defendant's testimony on cross-examination as to how and when he had obtained the weapon used in the homicide and the weapons and other items found in his bedroom on the night of the shooting; and second, that the potential prejudicial effect of the presence of the weapons and other items outweighed any probative value claimed by the state to exist.[20]

---

[20] The defendant's objection stated in relevant part: "I certainly object to that, Your Honor, and I would initially start off with the objection that I made the other day with respect to the prejudicial effect of the testimony about the guns coming in in the first place. Additionally, Your Honor, with respect to the particular items the State's intending to introduce, I don't follow, other than through speculation or just letting the jury kind of guess as to whether or not [the assistant state's attorney's] theory is correct, I don't see where those particular items support that theory. For example, the .41 caliber, I think the testimony is that there's, I think, some oil residue that's still remaining on that gun which would indicate that it would have been somewhat recently maintained I would just note that we're now on November 2nd of 1993, and that gun was taken on December 1st or 2nd of 1991, my guess would be that while it was sitting in evidence in Meriden in the police department, wherever the gun happened to be, it probably wasn't maintained over the last two years, so if the residue is there now, I think that tells us a little bit about how much that tells about the fact that oil residue exists in terms of how recently it may or may not have been maintained. The State's theory is it wouldn't have been found in a truck because it looked like it had been recently maintained and it had oil residue. My point is we're three years later and it still has oil residue, so I don't follow the logic of that at all. . . .

"The testimony in this case is that the gun was obtained on Monday, the shooting takes place the following Sunday, which is—I think the testimony is that the .38 was obtained on Monday. . . . The shooting takes place the following Sunday. We have six or seven days in the interim period, and I don't know how the fact of a changed grip or a holster or any of that supports the State's claim that the gun was actually purchased before that Monday preceding the shooting I just don't make that connection without allowing the jury to speculate all over the place to reach that. . . .

"We had a discussion with respect to the shotgun—we didn't talk in chambers about the shotgun in the case, but my objection to that would be that for the purpose for which it's offered, I guess the claim is since it's in a case and [the defendant] did not indicate through his testimony it was in a case, that that somehow refutes his testimony that it was purchased the Wednesday

"Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. *State* v. *Sinclair*, 197 Conn. 574, 579, 500 A.2d 539 (1985); *State* v. *Rothenberg*, 195 Conn. 253, 262, 487 A.2d 545 (1985); *State* v. *Braman*, 191 Conn. 670, 684–85, 469 A.2d 760 (1983). *State* v. *Weinberg*, 215 Conn. 231, 246, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). . . . This court reviews rulings solely on the ground on which the party's objection is based. *State* v. *Manning*, 162 Conn. 112, 118, 291 A.2d 750 (1971). . . . Moreover, articulating the basis of the objection alert[s] the court to any claims of error while there is still an opportunity for correction. . . . *State* v. *Dennison*, 220 Conn. 652, 657, 600 A.2d 1343 (1991). . . . *State* v. *Paulino*, 223 Conn. 461, 476, 613 A.2d 720 (1992)." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 739–40, 631 A.2d 288 (1993).

The defendant did not claim at trial that the admission of Hettrick's proposed testimony was an *improper method of impeachment* because it was "extrinsic misconduct evidence" offered to contradict the defendant on a "collateral issue." Rather, the defendant's counsel objected solely on the ground of relevancy. See footnote

before the shooting. [The defendant] was not asked whether or not it had a case, whether it had any other items that were purchased at the time the shotgun was purchased on the Wednesday, so, therefore, I would submit that that particular item does not go in any way that I can see to establish what the State intends to introduce it for, that being that it was in a case, that it was purchased sometime other than that Wednesday. I don't see the connection between these two, so I'd be objecting to the shotgun going in because I don't see the tie between the State's claim of relevance, that being that it's refuting [the defendant's] testimony that he purchased it on Wednesday. . . .

"With respect to the grips of the handgun. We talked about that at length, again, in chambers and, again, it is not clear to me how the existence of the grips either establishes or fails to—or refutes or rebuts [the defendant's] testimony that the gun was purchased on the Monday prior to the shooting. I just—I'm missing the logical connection as to how that rebuts his testimony that that's when he purchased that gun."

20 and accompanying text. "Consequently, neither the trial court nor the prosecution was alerted to the possibility that the defendant's objection was grounded on anything other than relevancy. The state, therefore, did not have the opportunity to address or the court the occasion to rule on other grounds. Thus, to review the defendant's claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . *State* v. *Brice*, [186 Conn. 449, 457, 442 A.2d 906 (1982)], quoting *State* v. *DeGennaro*, 147 Conn. 296, 304, 160 A.2d 480, cert. denied, 364 U.S. 873, 81 S. Ct. 116, 5 L. Ed. 2d 95 (1960). *State* v. *Braman*, supra, [191 Conn.] 685." (Internal quotation marks omitted.) *State* v. *Robinson*, supra, 227 Conn. 740–41.

The defendant also argues, however, as he did at trial, that the actual weapons and related items and Hettrick's testimony concerning the weapons were not relevant, and that the admission of the weapons themselves as exhibits was improper. He claims that the weapons did not tend to contradict the defendant's cross-examination testimony regarding when and how he had obtained the revolver used in the homicide and the guns and other items found in his bedroom on the night of the shooting. We will review this claim by analyzing Hettrick's testimony as to each individual item.

First, Hettrick testified with regard to the .41 caliber revolver found in the defendant's bedroom. According to Hettrick, the weapon was found in a well oiled, working condition. Thereafter, the state offered the weapon into evidence as an exhibit. Although the defendant argues that the oiled and overall excellent condition of the .41 caliber revolver did not serve to contradict the defendant's testimony that he had recently found it in a truck in a junkyard, we agree with the state and with the trial court that the objection went to the weight, not to the admissibility, of the evidence. In short, we

cannot conclude that the evidence of the condition of the .41 caliber revolver could not have made the defendant's account of how, when and where he had obtained that weapon less probable than without that evidence. Moreover, because it was the actual physical condition of the weapon that had probative value, we cannot conclude that the court abused its discretion in permitting the jury to inspect the weapon's condition firsthand.

Second, Hettrick testified regarding the .38 caliber revolver used by the defendant to kill the victim, and to the holster, wooden handle grips, and speed loader found in the defendant's bedroom. According to Hettrick, the gun was manufactured by Rossi, and had rubber handle grips on it at the time the defendant used it to shoot the victim. Hettrick further indicated that new handguns are not sold with rubber handle grips, but rather with wooden handle grips such as the Rossi brand grips found in the defendant's bedroom. Additionally, Hettrick demonstrated that the .38 caliber revolver fit into the holster, and that the speed loader, which was found filled with .38 caliber cartridges, and the Rossi brand wooden handle grips fit the weapon perfectly.

The defendant argues that evidence of the wooden handle grips, the holster and the speed loader was irrelevant to contradict his testimony regarding when and where he had obtained the .38 caliber revolver. We agree with the trial court and with the state, however, that a possible inference the jury could have drawn from the existence of these items was that, because the defendant had failed to testify that the .38 caliber revolver came with a holster and spare handle grips (and because it was not likely that a handgun purchased on the black market in Waterbury would have come equipped with such accessories), and because the defendant had testified that he had found the speed loader in 1986 or 1987 in a junkyard, the defendant had

in reality obtained the .38 caliber revolver earlier than he claimed to have obtained it. We therefore conclude that the trial court did not abuse its discretion in finding the evidence regarding these items to be relevant. We also conclude that the trial court did not abuse its discretion in permitting the jury to inspect the items in order to ascertain for themselves whether the accessories were compatible with the revolver.

Finally, Hettrick testified regarding the gun case that was found in the defendant's bedroom. According to Hettrick, when the case was opened, it was found to contain a shotgun and shotgun shells. The state offered the case, the shotgun, and the shells into evidence as one exhibit. The defendant claims that the evidence of the carrying case, the shotgun and the shotgun shells did not contradict his cross-examination testimony as to when and how he had obtained them. The state argues, however, and we agree, that the jury could have inferred that because the defendant failed to mention the shotgun case when he testified regarding his acquisition of the shotgun (and because it was not likely that a shotgun purchased on the street would have come enclosed within a well conditioned carrying case), and because the defendant testified that he had obtained the appropriate gauge shotgun shells from a junkyard in 1986 or 1987, his account of how and when he had obtained the shotgun was not credible. Thus, we cannot conclude that the trial court abused its discretion in finding that the evidence of the shotgun, the shotgun case, and the shotgun shells was relevant and hence admissible.

The defendant also claims, however, that regardless of whether the trial court improperly determined that Hettrick's testimony and the weapons and other items were relevant, the trial court nevertheless should have precluded the admission of the evidence because its potential prejudicial effect on the jury far outweighed

its alleged probative value. The defendant argues that because he was charged with having committed a murder with a firearm, the physical presence of the weapons and related items had the potential to "bring to the jury's attention the defendant's violent disposition, his bad character, and his predisposition to commit crimes of a violent nature." See 4 J. Wigmore, Evidence (Chadbourn Rev. 1972) § 1157, p. 340 ("the sight of deadly weapons . . . tends to overwhelm reason and to associate the accused with the [crime] without sufficient evidence"). We have previously noted, however, that a trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission, and that we will not overturn a trial court's decision absent a clear abuse of that discretion. See previous discussion; see also *State* v. *McGraw*, supra, 204 Conn. 449–50. Moreover, we note that Hettrick's testimony and the physical presence of the weapons and related items were offered by the state not on a "side issue"; *State* v. *Greene*, supra, 209 Conn. 478–79; but, rather, for the express purpose of discrediting the defendant's account of when and how he had obtained both the weapons found in his bedroom on the night of the shooting and the very weapon used to commit the homicide. As the state indicates, if the jury chose to disbelieve, because of this evidence, the defendant's account of when and where he had obtained the weapons found in his bedroom and the weapon used for the homicide, the jury might also have chosen to disbelieve the defendant's testimony that the victim had threatened him on the Monday and Wednesday before the deadly confrontation. Thus, this evidence, through a series of related inferences, ultimately could have been used by the jury to discredit the very heart of the defendant's claim of self-defense. Additionally, we note that the trial court twice instructed the jury as to the limited

purpose for which the evidence was offered. First, at the time the evidence was offered, the court stated: "You heard his testimony explaining how he acquired them, where he acquired them, when he acquired them and the Court has allowed all of these implements to be put into evidence for your consideration bearing on the credibility of that testimony by the defendant and that's the only purpose for which they were offered." Subsequently, in its final jury charge, the court again instructed: "The evidence regarding the various guns that were introduced during the State's case on rebuttal near the end of the entire case, that evidence was only offered for a limited purpose. That evidence may be considered by you only to rebut [the defendant's] testimony about when and how he obtained those guns. If, in fact, you find that the evidence does rebut that part of his testimony, it cannot be used in any manner to reflect upon [the defendant's] character or his propensity to commit the crimes charged." In the absence of a fair indication to the contrary, we presume that the jury adhered to these instructions. *State* v. *Reddick*, 224 Conn. 445, 454, 619 A.2d 453 (1993); *State* v. *Asherman*, 193 Conn. 695, 737–38, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Griffin*, 175 Conn. 155, 160, 397 A.2d 89 (1978). In view of the fact that the state bore the burden of disproving the defendant's claim beyond a reasonable doubt, and in view of the fact that Hettrick's rebuttal testimony did not consume an undue amount of time; *State* v. *Greene*, supra, 478; we cannot conclude that the trial court abused its broad discretion in concluding that the probative value of the evidence was not outweighed by its potential prejudicial effect.

## III

The defendant next contends that the trial court permitted the state to engage in improper closing argument. According to the defendant, the assistant state's

attorney improperly: (1) misrepresented the medical examiner's testimony and urged the jury to draw inferences not supported by the record; and (2) injected his own personal belief regarding the ultimate conclusion to be reached by the jury. We disagree.

The following facts are relevant to our resolution of this issue. At trial, the state announced its intention to offer the testimony of Thomas Gilchrist, the forensic pathologist who had performed the autopsy on the victim. The defendant, however, filed a motion in limine requesting that the trial court preclude Gilchrist from testifying as to the position of the victim's body at the time he was shot. In support of the motion, the defendant argued that he believed that the state intended to ask Gilchrist hypothetical questions seeking his opinion as to whether the bullet tracks in the victim's leg and abdomen were consistent with the victim lying on the ground when the wounds were inflicted. The defendant argued that in order for such an opinion to be offered, there first must have been facts introduced into evidence which "fix the position of the gun which inflicted the aforementioned wounds." According to the defendant's motion, those required facts did not exist. The trial court declined to rule on the defendant's motion until the issue actually arose during Gilchrist's testimony.

Thereafter, the state commenced its direct examination of Gilchrist. Gilchrist testified in detail regarding the four bullet wounds to the victim's body—one to the head, one to the back, one to the abdomen and one to the thigh. With respect to the bullet wounds to the victim's head and back, Gilchrist testified that the bullets traveled on a downward course. Gilchrist further testified, however, that with respect to the bullet wounds to the victim's abdomen and thigh, the bullets traveled on an upward course.

The state then indicated that it intended to elicit from Gilchrist his opinion, based upon the forensic evidence,

as to the position of the victim's body at the time of penetration of each bullet. The trial court excused the jury, and the state asked Gilchrist its proposed question: "Doctor, I'd like to ask you a couple of questions. Assuming that there is evidence in this case that the victim had been descending a flight of steps prior to the time he was shot and was, in fact, found on a landing suffering from gunshot wounds, do you have any opinion as to the position of the victim at the time of the shots to the head and back were inflicted?" Gilchrist answered, however, "[n]o, not with[out] more information about where the shooter might be and at what level." The state then instructed Gilchrist to assume that the shooter was standing in the foyer area at the bottom of the stairs that led to Huffman's apartment, holding his gun with his arm extended horizontally in front of him. With this premise in mind, Gilchrist testified that the bullet wounds to the head and back were consistent with a scenario in which the victim had crouched at the bottom of the stairs to avoid gunshots coming from his left.  Gilchrist also indicated that, assuming that the shooter was positioned as the state had advised him to assume that he was, the upward track of the bullet wounds to the abdomen and thigh suggested that the victim was lying on his back when the bullets entered his body. Gilchrist also testified that none of the four bullet wounds could have been inflicted while the shooter and the victim stood face-to-face. Further, with regard to the wounds to the victim's abdomen and thigh, Gilchrist testified that because of the upward angle of the tracks, they could not have been inflicted while both the shooter and the victim were standing.

At the conclusion of the state's offer of proof, the defendant argued that the trial court should exclude Gilchrist's testimony regarding the positions of the victim's body upon the entry of each bullet, because Gilchrist's opinion was based upon assumptions as to the

position of the shooter that were not conclusively ascertainable from the evidence. The court agreed with the defendant, stating that "I think that any of the hypotheticals which depend upon establishing the location of the gun when it went off, I think the objection is well taken because I do not think the evidence is sufficient to establish where the gun was when it actually was fired to enable the Doctor to give an opinion as to the position of the victim at that point." The trial court did not prohibit Gilchrist, however, from giving his opinions that the shooter and the victim could not have both been standing face-to-face at the time the bullets entered the victim's body and that either the shooter or the victim had to be on the ground at the time the bullets entered the victim's abdomen and thigh. The state thereafter offered Gilchrist's testimony in the presence of the jury.

At the conclusion of the trial, the state in its closing argument to the jury stated that "[Gilchrist] told you that the abdomen and the leg wounds, however, interestingly enough, went from front to back and upwards. And I would submit to you that those wounds are consistent with the gun being fired first from the victim's left, just as Detective Gibbs testified to, consistent with the victim being ambushed in this case as the defendant was in that corner, the victim walking down those steps completely unaware that the defendant was lurking there with a .38 caliber handgun. He was ambushed, he was shot twice on the side of the head and the back, he fell to the ground. [The defendant] walked up to [the victim] and shot him two more times as he was down, in the abdomen and the leg, and that was testified to, I would submit to you, and that is a reasonable inference for you to make based on Dr. Gilchrist's testimony when he told you that it would be impossible for those two wounds to have been inflicted while both people were standing up. And since [the defendant] never testified that he was shooting from his back up, which would

account for one way to get an upward angle, the only other explanation is that [the victim] was on the ground mortally wounded and [the defendant] walked up to him and finished the job and shot him two more times."

The defendant interrupted the state's argument and requested that the jury be excused. The defendant contended that the prosecutor, "during the course of his argument, has introduced what he was trying to get in through an expert opinion which requires no less speculation than it did for the Doctor." The trial court rejected the defendant's objection, however, stating that "[the assistant state's attorney has] a right to argue inferences. The Doctor did testify as to certain evidence about the position of the entry—the way the wounds came in, that they were not standing facing each other or words to that effect. . . . [The assistant state's attorney has] a right to argue how the jury should interpret that evidence and what inferences he claims they should draw. I will give the jury an instruction on circumstantial evidence and drawing inferences and they can only draw the inferences which are reasonably supported by the evidence and whatever the words are that were used, that doesn't mean the State can't argue inferences." The state thereafter continued with its closing statement, and concluded with the following: "[The defendant] was in the corner . . . the first three shots are the ones that hit him in the head, hit him in the back, the one that misses that's lodged in the wall . . . [the victim] is mortally wounded, [the defendant] walks up to him and fires two more times, as I indicated, to finish the job. And if that doesn't show an intent to kill, if that doesn't show murder, then I don't know what does, and I would submit to you, ladies and gentlemen, that the only fair verdict in this case is guilty as charged on all counts."

The defendant contends that the state's remarks indicating that the defendant had first shot the victim in the head and the back, then approached him as he laid on

the ground and fired two more shots to the abdomen and thigh, misstated the record and urged the jury to draw an inference not supported by the evidence. The defendant argues that because the trial court had earlier concluded that Gilchrist could not give his expert opinion as to the position of the victim's body at the time each bullet had entered it because the evidence did not conclusively establish how the shooter was positioned at the time he fired the shots, the state's closing argument invited the jury to draw inferences unsupported by the evidence in the record.

"Counsel may comment upon facts properly in evidence and upon *reasonable* inferences to be drawn from them. *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977). Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 58, 612 A.2d 755 (1992). Ultimately, however, the scope of final argument lies within the sound discretion of the trial court. Id., 59.

We cannot agree with the defendant that the state should have been precluded from urging the jury to draw the inferences regarding the positioning of the victim's body, despite the trial court's earlier ruling with respect to Gilchrist. As the state points out, Gilchrist was permitted to testify as to the downward tracks of the wounds to the victim's head and back and the upward tracks of the wounds to the victim's abdomen and thigh. Likewise, Gilchrist was permitted to testify that the wounds to the victim's abdomen and thigh could not have been inflicted while both men were standing. Additionally, Gilchrist testified that people who sustain head injuries often reflexively grasp whatever happens to be in their hands at the time. On the basis of this evidence, the jury legitimately could have inferred that the defendant first shot the victim in the head, because otherwise the victim would have dropped the cookies

that were found clasped in his right hand. Further, on the basis of Gilchrist's testimony that the shooter and the victim both could not have been standing at the time the wounds to the victim's abdomen and thigh were sustained, coupled with the defendant's own testimony that he stood upright with his shooting arm extended throughout the entire incident, the jury reasonably could have inferred that the defendant had shot the victim in the abdomen and thigh after the victim had fallen to the floor. Because the inferences argued by the state were reasonable inferences supported by the facts in evidence, the trial court did not abuse its discretion in permitting the state to urge the jury to draw them.[21]

## IV

The defendant finally claims that the trial court improperly instructed the jury on the element of intent. Specifically, he claims that the trial court's statement to the jury that "[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct" permitted the jury to find the defendant guilty of murder, even if it did not find that the defendant had the conscious objective to cause the death of the victim, so long as it found that the defendant had the conscious objective to engage in the conduct that eventually caused the death. The state, on the other hand, argues that the trial court's instruction as a whole guided the jury to a proper verdict. We agree with the state.

---

[21] The defendant also claims that the assistant state's attorney, in concluding that "if that doesn't show an intent to kill, if that doesn't show murder, then I don't know what does," impermissibly stated his personal opinion as to the guilt of the defendant. This claim is without merit. Although a prosecutor is precluded from stating his personal view, either directly or indirectly, as to the guilt or innocence of the defendant; *State* v. *Williams*, 204 Conn. 523, 541, 529 A.2d 653 (1987); the assistant state's attorney simply argued that the facts recited here established the existence of the elements of the crime charged.

"The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 223, 658 A.2d 571 (1995). The trial court, in defining intent, read to the jury the *entire* statutory definition contained in General Statutes § 53a-3 (11), which contains references to both intent to cause a result *and* intent to engage in proscribed conduct. We agree with the defendant that that portion of § 53a-3 (11) dealing with the intent to engage in proscribed conduct is irrelevant to a murder prosecution pursuant to § 53a-54a. We are not persuaded, however, that the trial court's instruction as a whole misled the jury.

We have reviewed the trial court's entire charge, and note that the court repeatedly instructed the jury that in order to find the defendant guilty of murder, it first had to find that he had intended to cause the death of the victim. Indeed, the trial court's only reference to the intent to "engage in conduct" was contained in its recitation of the language of the statute. "It strains reason to believe that the jury could have heard the challenged instruction as not requiring that the state prove beyond a reasonable doubt that the defendant intended to kill [the victim]." *State* v. *Jaynes*, 36 Conn. App. 417, 429, 650 A.2d 1261 (1994). We therefore reject the defendant's final claim.

The judgment is affirmed.

In this opinion PETERS, C. J., and PALMER, J., concurred.

NORCOTT, J., concurring. I agree with parts I, III and IV of the majority opinion, and with the majority's conclusion that the defendant's convictions should be affirmed. In my view, however, the evidence of the other

guns was more prejudicial than probative and the trial court improperly admitted them into evidence. Notwithstanding, I agree with the majority's conclusion because I believe that the admission of this evidence was harmless error.

A trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission. *State* v. *McGraw*, 204 Conn. 441, 449–50, 528 A.2d 821 (1987). Such a determination will not be disturbed on appeal unless a clear abuse of discretion is shown. *State* v. *King*, 216 Conn. 585, 603, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991).

Although it is true that all adverse evidence is damaging to the defendant's case, "[t]here are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion." (Internal quotation marks omitted.) *State* v. *Holliman*, 214 Conn. 38, 51, 570 A.2d 680 (1990). "The prejudicial effect that the rules of evidence are designed to alleviate is that which 'results from an aspect of the evidence other than its tendency to make the existence of a material fact more or less probable, e.g., that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.' *United States* v. *Bailleaux*, 685 F.2d 1105, 1111 (9th Cir. 1982); see *State* v. *DeMatteo*, [186 Conn. 696, 703, 443 A.2d 915 (1982)]." *State* v. *Joly*, 219 Conn. 234, 253, 593 A.2d 96 (1991).

In the present case, the defendant argues that Detective Robert Hettrick's testimony and the physical presence of the weapons were more prejudicial than probative. Specifically, the defendant argues that

because he was charged with having committed a murder with a firearm, the physical presence of the weapons in the jury room had the potential to "bring to the jury's attention the defendant's violent disposition, his bad character, and his predisposition to commit crimes of a violent nature." I agree.

First, I believe that the evidence of the other guns was likely to provoke an undue emotional response or hostility from the jurors. "[T]he sight of deadly weapons . . . tends to overwhelm reason and to associate the accused with the [crime] without sufficient evidence." 4 J. Wigmore, Evidence (Chadbourn Rev. 1972) § 1157, p. 340; see also 2 D. Louisell & C. Mueller, Federal Evidence (1985) § 403.

Second, the evidence of these other guns was extraneous to the issue at trial, which was whether the defendant, at the time of the confrontation, was justified in shooting the victim in self-defense. "Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." *State* v. *DeMatteo*, 186 Conn. 696, 703, 443 A.2d 915 (1982). It is clear from the record that the state sought to prove that the defendant planned and carried out an ambush of the victim. The defendant claimed that he shot the victim in self-defense. The other gun evidence did not directly prove either the state's or the defendant's case. Rather, this evidence was relevant to the credibility of the defendant[1] as a witness, seeking to rebut the defendant's account of when, where and how

---

[1] The court stated that the state's evidence "is offered bearing on the credibility of the defendant with respect to what he testified to yesterday as to where and how he obtained these guns." The court instructed the jury: "You heard his testimony explaining how he acquired them, where he acquired them, when he acquired them and the Court has allowed all of these implements to be put into evidence for your consideration bearing on the credibility of that testimony by the defendant and that's the only purpose for which they were offered."

he purchased the guns. As the Appellate Court noted in *State* v. *Busque*, 31 Conn. App. 120, 129, 623 A.2d 532 (1993), appeal dismissed, 229 Conn. 839, 643 A.2d 1281 (1994), "[c]redibility, unlike intent . . . is not an element of the crimes charged in this case." In cases where the proffered evidence is merely relevant to credibility, as opposed to an element of the crime charged, there is a higher threshold in admitting prejudicial evidence. See id.

I believe that this line of questioning was more prejudicial than it was probative, and that the trial court abused its discretion in admitting it into evidence. Although this evidence was minimally probative, its potential prejudice was substantial. I fail to see what these other guns had to do with the gravamen of the case and why the placing of this veritable arsenal before the jury did not prejudicially cast the defendant as a bad character. In addition, I believe that the jury may have regarded this evidence as a sign of the defendant's aggressive nature or his violent predisposition. In sum, the introduction of Hettrick's testimony concerning the other guns and the introduction of the guns themselves conjured up numerous unfounded, but, nevertheless, damaging impressions in the jurors' minds. In view of the meager utility of the evidence, I believe that it should not have been admitted and that the trial court abused its wide discretion in allowing this evidence.

While I am troubled by the introduction of this evidence, I further recognize that the trial court's action must be subjected to a harmless error analysis. "Because the defendant's claim does not involve the violation of a constitutional right, the burden rests upon him to demonstrate the harmfulness of the court's error." *State* v. *Dennison*, 220 Conn. 652, 661, 600 A.2d 1343 (1991); *State* v. *Burak*, 201 Conn. 517, 527, 518 A.2d 639 (1986); *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985); *State* v. *Cooper*, 182 Conn. 207, 212,

438 A.2d 418 (1980). To demonstrate harmfulness, the defendant must show that it is more probable than not that the court's action affected the result of his trial. *State* v. *Payne*, 219 Conn. 93, 102–103, 591 A.2d 1246 (1991); *State* v. *Sierra*, 213 Conn. 422, 436–37, 568 A.2d 448 (1990); *State* v. *Vilalastra*, 207 Conn. 35, 47, 540 A.2d 42 (1988); *State* v. *Jones*, 205 Conn. 723, 732, 535 A.2d 808 (1988). My review of the transcript demonstrates that the state produced compelling evidence of the defendant's guilt. Indeed, I believe that the medical evidence alone, in that it wholly discredits the defendant's version of the hallway confrontation, may have been sufficient to convict the defendant. Therefore, although the evidence tended to prejudice the defendant and had little probative value, I believe that its improper admission was harmless.

As a result, I concur in the result of part II of the majority's opinion, but would analyze the issue as stated previously.

BERDON, J., dissenting. The trial court, in my view, should not have allowed the state to cross-examine the defendant, Herbert Prioleau, about the other weapons found in his apartment and should not have allowed these other weapons to be admitted into evidence. I reach this conclusion for three reasons: (1) the defendant's statements that the state sought to attack were irrelevant, collateral issues and, as such, should not have been grounds for impeachment; (2) the impeaching evidence used by the state—the other weapons found in the defendant's apartment—was evidence of other misconduct and, as such, was inadmissible; and (3) the prejudice suffered by the defendant as a result of the admission into evidence of the weapons outweighed any probative value they may have had.

I

During direct examination, the defendant made a very limited reference to the weapon he had used to shoot

the victim. The defendant testified that before leaving his apartment immediately before encountering the victim, he had put on his coat. In the right pocket of the coat, he testified, was a .38 caliber pistol. The defendant testified that this was the weapon he had pulled out of his coat and used to shoot the victim. As the majority notes, although the defendant "testified in detail on direct examination regarding the shooting itself and the circumstances leading up to the fatal encounter, *he intentionally refrained from testifying as to the type of gun used or as to where, when or how he had acquired it.*" (Emphasis added.)

Nevertheless, during cross-examination, the state expanded the scope of the defendant's testimony with a series of seemingly innocuous questions. This colloquy was as follows:

"Q. When did you buy the gun, sir?

"A. On Monday after [the victim] told me he was going to kill me.

"Q. The Monday after [the victim] told you he was going to kill you. All right. Which was when, sir?

"A. That would be around the 25th or the 24th, something like that.

"Q. Of November.

"A. Yes, sir.

"Q. So, you needed to go buy a gun, is that your testimony?

"A. That's right."

The state then asked the following question, over the objection of the defendant:

"Q. Is that because you didn't have any guns in the house?

"A. That's right."

It was in response to this latter answer by the defendant, to a question to which his counsel objected, that the state justified launching into an avalanche of prejudicial evidence.[1] Over the objection of the defendant, the state introduced into evidence the following weapons, ammunition and firearm accessories (hereinafter weapons) that were found in the defendant's apartment but were otherwise totally unrelated to this case: a loaded .41 caliber revolver; a shotgun case containing a loaded shotgun; several rounds of ammunition for the shotgun; Rossi brand pistol grips; a holster that would hold the .38 caliber revolver the defendant had used to shoot the victim; and a speed loader for .38 caliber bullets. This line of questioning, therefore, was a cleverly crafted strategy on the part of the state to bring into evidence through the back door what it could not bring in through the front: evidence of other misconduct by the defendant.

Nevertheless, the questions asked by the state, and the responses given by the defendant, had no relevance to the issues presented by this case.[2] Indeed, the questions asked by the state did not have any bearing on points raised during the direct examination of the defendant. Rather, this series of questions gradually

---

[1] After the defendant answered the last question, the prosecutor indicated outside the presence of the jury that "I intend to submit evidence now [that] when the police searched this man's house that he had a gun that had ammunition different than what has been introduced here, Judge, which is directly contrary to what he just testified to."

[2] The majority dismisses this argument of the defendant on the basis that he "did not claim at trial that the admission of the [police testimony regarding the other weapons] was an *improper method of impeachment* because it was 'extrinsic misconduct evidence' offered to contradict the defendant on a 'collateral issue.' Rather, the defendant's counsel objected solely on the ground of relevancy." (Emphasis in original.) In my view, however, the defendant's timely objections to the line of questioning of the defendant by the state, and to the proposed police testimony about the other weapons found in the defendant's apartment, was sufficient to preserve this claim for review.

went beyond the scope of the direct examination, raising issues the only purpose of which was to allow impeachment of the defendant. The state, therefore, should not have been allowed to impeach the defendant on the basis of the answers he had given to these irrelevant questions. "A witness cannot be impeached by contradicting his testimony as to collateral matters, that is, matters not material to the merits of the case. *State* v. *Wilson*, 158 Conn. 321, 324, 260 A.2d 571 (1969); 2 B. Holden & J. Daly, Connecticut Evidence (1988) § 125d (1), p. 1270." *State* v. *Graham*, 21 Conn. App. 688, 703, 575 A.2d 1057, cert. denied, 216 Conn. 805, 577 A.2d 1063 (1990). Accordingly, the trial court should not have allowed the state to impeach the testimony of the defendant.

II

Moreover, this evidence used by the state to impeach the defendant was not properly admitted. By introducing evidence of the other weapons found in the defendant's apartment, the state left the jury with the impression that the defendant possessed a violent disposition, bad character and a predisposition to commit crimes of a violent nature.

Misconduct evidence of this type is not admissible to show that a defendant is guilty of the crime with which he is charged. "It is fundamental to American jurisprudence that a defendant must be tried for what he did, not for who he is." (Internal quotation marks omitted.) *United States* v. *Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980). "The rationale of this rule [making evidence of other misconduct inadmissible] is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. . . . Evidence of other misconduct, however, may be allowed for the purpose of proving many different things, such as intent,

identity, malice, motive or a system of criminal activity. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *O'Neill*, 200 Conn. 268, 273, 511 A.2d 321 (1986).

The evidence of the other weapons found in the defendant's apartment does not satisfy any of these exceptions to the rule. Rather, the state introduced the evidence of the other weapons solely as a means to impeach the defendant. As such, the trial court should not have allowed the state to admit these other weapons into evidence.

### III

Finally, even if the basis for impeachment was sound, and even if misconduct evidence, as a general principle, may be used for such a purpose, the trial court should not have allowed the misconduct evidence to be used in this manner in this case. In short, the prejudice suffered by the defendant as a result of the testimony regarding the discovery of the weapons in his apartment, as well as the admission into evidence of the weapons themselves, outweighed any probative use they may have had. See generally *State* v. *Morowitz*, 200 Conn. 440, 443, 512 A.2d 175 (1986). I disagree both with the standard employed by the majority to analyze this issue and with the conclusion that the majority draws therefrom.

The majority mischaracterizes and misapplies the degree of discretion a trial court may exercise in determining whether the prejudicial effect of evidence outweighs any probative value. The majority states that a trial court has "broad discretion" to make this determination. Because of the highly prejudicial effect of misconduct evidence, however, the applicable discretion is not "broad" but rather quite *limited*. Indeed, the trial court's discretion in this circumstance has always been limited by what I consider to be a very important consid-

eration—*justice.* As Justice Longo wrote for a unanimous court sixteen years ago: "Discretion . . . imports something more than leeway in decision-making. . . . Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. In a plain case this discretion has no office to perform, and its exercise is limited to doubtful cases, where an impartial mind hesitates. . . . When assessing the admissibility of other crimes evidence, the application of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification. The problem is thus one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence. . . . Put another way, if the issue to be proved is competent but can just as well be demonstrated by other evidence, or if the evidence is of but slight weight or importance upon that point, a trial judge is justified in excluding the evidence entirely, if its probative value is marginal and its prejudicial tendencies clear. Such a balancing calls for a large measure of individual judgment about the relative gravity of imponderables. It should be recognized, however, that the discretion invested in the trial court is not a license to depart from the principle that evidence of other crimes, having no substantial relevancy except to ground the inference that the accused is a bad person and hence probably committed this crime, must be excluded. *The leeway of discretion lies rather in the opposite direction, empowering the judge to exclude the other-crimes evidence, even when it has substantial*

*independent relevancy,* if in his judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial. . . . A decision clearly wrong on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion. . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Onofrio,* 179 Conn. 23, 29–30, 425 A.2d 560 (1979).

In my view, the trial court, in allowing the evidence of the weapons to be introduced in this case, abused the limited discretion with which it was vested.[3] Indeed, by allowing the other weapons into evidence as full exhibits, the trial court set the stage for a highly prejudicial impact on the jury. One of the police officers demonstrated in front of the jury how to use a speed loader and pistol grips. Moreover, the jurors were allowed to take the weapons into the deliberating room with them. Because the defendant was charged with having committed a murder with a firearm, the physical presence of the weapons undoubtedly had a very powerful impact on the jurors. Indeed, I agree with Justice Norcott that "the evidence of the other guns was likely to provoke an undue emotional response or hostility from the jurors. [T]he sight of deadly weapons . . . tends to overwhelm reason and to associate the accused with the [crime] without sufficient evidence. . . . I fail to see what these other guns had to do with the gravamen of the case and why the placing of this veritable arsenal

---

[3] Indeed, the transcripts do not demonstrate that the trial court even considered the merits of the defendant's argument that the prejudicial effect of the weapons testimony outweighed any probative value. Although the defendant twice voiced this claim, the trial court never explained why the probative value outweighed the prejudicial effect. Moreover, the trial court never acknowledged that the admission into evidence of the weapons would have any prejudicial effect whatsoever. For this reason alone, I would reverse the defendant's conviction and order a new trial.

before the jury did not prejudicially cast the defendant as a bad character." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau,* supra, 324–25 (*Norcott, J.,* concurring).[4] The defendant's other weapons should not have been admitted into evidence.

Furthermore, I disagree with the majority that the trial court's limiting instructions alleviated any prejudice that may have resulted from the admission into evidence of the weapons. This court has recognized the reality of highly prejudicial evidence. "[W]e have . . . held that a curative instruction is not inevidently sufficient to overcome the prejudicial impact of [misconduct] evidence." (Internal quotation marks omitted.) *State* v. *Horne,* 215 Conn. 538, 551, 577 A.2d 694 (1990). "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." (Citation omitted.) *Krulewitch* v. *United States,* 336 U.S. 440, 453, 69 S. Ct. 716, 93 L. Ed. 790 (1949) (Jackson, J., concurring).

Accordingly, I would reverse the conviction of the defendant and order a new trial. See, e.g., *State* v. *Onofrio,* supra, 179 Conn. 23 (reversing conviction where photographs of several weapons had been admitted into evidence in order to impeach credibility of defendant's wife).

I respectfully dissent.

---

[4] Nevertheless, I disagree with Justice Norcott that the error was harmless because of the "compelling evidence of the defendant's guilt" adduced by the state. "Any improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless." (Internal quotation marks omitted.) *State* v. *Onofrio,* supra, 179 Conn. 32. Furthermore, the medical evidence, upon which Justice Norcott principally relies, is not conclusive. The medical examiner testified that, on the basis of the bullet wounds, he could only determine the relative positioning of the defendant and the victim, and that he could not determine in which order the shots were inflicted, the defendant's distance from the victim at the time of the shooting, or whether the wounds had been inflicted in rapid succession.